**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL B. KOLAR, | ) | CASE NO. 5:21-CV-01490-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Michael Kolar ("Kolar") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Kolar's assignments of error and AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On June 13, 2019, Kolar filed an application for DIB, alleging a disability onset date of March 30, 2017. (ECF Doc. No. 5, Exhibit 1D, PageID # 316). The application was denied initially and upon reconsideration, and Kolar requested a hearing before an administrative law judge ("ALJ"). (ECF Doc. No. 5, Exhibit 4B, PageID # 256; ECF Doc. No. 5, Exhibit 6B, PageID # 264). On August 27, 2020, an ALJ held a hearing via telephone during which Kolar, represented by counsel, and an impartial vocational expert testified. (ECF Doc. No. 5, PageID # 172). On September 18, 2020, the ALJ issued a written decision finding Kolar was not disabled. (ECF Doc. No. 5, PageID # 62). The ALJ's decision became final on June 1, 2021, when the Appeals Council

declined further review. (ECF Doc. No. 5, PageID # 21).

On July 31, 2021, Kolar filed his complaint to challenge the Commissioner's final decision.

(ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 9-1, 11, 12).

Kolar asserts the following assignments of error:

(1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul was constitutionally defective.

(2) The ALJ's RFC was not supported by substantial evidence as she failed to properly evaluate the evidence documenting the combination of Kolar's severe impairments and the fact that the evidence supported that the combination of his impairments precluded him from engaging in substantial gainful activity on a sustained and full-time basis.

(3) The ALJ erred in her determination regarding the persuasiveness of Kolar's treating sources and when she failed to include the need for a cane in her RFC.

(ECF Doc. No. 9-1, PageID # 1119).

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Kolar was born on September 10, 1983, and he was 33 years old on the alleged onset date.

(ECF Doc. No. 5, PageID # 179). Kolar has a GED and was working as a landscaper when he

suffered a traumatic injury to his left foot that required amputation. (ECF Doc. No. 5, PageID #

181, 43). He subsequently received treatment for anxiety and depression related to his injury. (*See*

ECF Doc. No. 5, PageID # 36).

### B.    Relevant Hearing Testimony

The ALJ summarized Kolar's written statements and hearing testimony as follows:

Written statements offered in support of the claimant's application allege disability because of partial amputation of the left foot with constant pain there, additional pain in his left calf muscle and knee, pain in the right hip, and pain in the lower back; and because of concentration problems and depression/ anxiety (Ex. 1E/2,6). Mr. Kolar has alleged chronic pain in the left foot and ankle, including phantom foot pain, that is constant in frequency, worsening in severity per his level of activity and

2

with standing or walking for prolonged periods, and limits his balancing ability and ability to walk on uneven surfaces, his ability to put on footwear, and his ability to negotiate stairs (Ex. 1E/10; 3E/1). He specified that he can walk and stand for no longer than 20 to 30 minutes, even with wearing daily an ankle-foot orthotic (AFO) brace and with toe-filler orthotic and carbon fiber inserts worn inside his shoe (Ex. 3E/2,6,7).

Mr. Kolar has also alleged having interrelated pain with anxiety that disrupt his sleep at night and prevent him from maintaining concentration and attention for longer than 10 minutes, such that he does not finish tasks that he starts (Ex. 3E/1,6). He also described having a short temper and finding that his anxiety increases with stress.

Subsequent statements accompanying the claimant's requests for reconsideration and for this hearing allege worsening intensity of pain, worsening anxiety to the extent that he only leaves the house when absolutely necessary, worsening sleep difficulties ("insomnia"), and extension of pain into both knees that further limits standing, ability to navigate steps within his house, and even sitting in one position for periods of 45 minutes (Ex. 6E/2,7; 7E/2,5). Mr. Kolar described pain as "tremendous" and "extreme" after doing essentially any activity at home that involves standing or walking around the house, such as cooking and picking up after his 4-year-old son, and he asserted that he sometimes needs assistance with changing positions.

At the August 2020 hearing in this matter, the claimant testified that he remains unable to work including even performing a primarily seated job because of the combination of and interactivity between ongoing, constant pain in the left foot and mental symptoms primarily relating to anxiety but also including inability to control his temper and "snapping" at others when angry. Mr. Kolar testified that the constant pain in the foot has been present since the amputation injury and after two surgeries. He located the primary pain in the foot extending up to the ankle and, at times, to the hip and back due to compensating his weight onto the one leg when standing or walking; and he described it as dual "bone" and "nerve" pains that are akin to a throbbing toothache. He testified that pain increases in intensity with wearing shoes, such that he has recently been wearing "Crocs" only due to less pressure thru the orthotic inserts that he still uses, and proportionately worsens with the more activity that he does. He further testified that pain limits sleep to two hours "maybe" and leaves him awake for the next three to four hours. He added that he has been walking on the outside of the left foot, with his heel "turned in," and explained that he was recently prescribed a cane by his podiatrist, that he had just been fitted for a cane on the day before the hearing, and that another surgery is currently being discussed.

The claimant also testified that, as pain increases, he becomes more irritable and cannot focus on tasks. Poignantly and appearing to hold back tears at this point of the telephone hearing, Mr. Kolar testified that his wife has been taking on the burden of working since his injury and due to his physical limitations, and he expressed that he feels down and depressed and continues to have difficulty adjusting to his condition. He stated that he takes a medication prescribed by his primary care

physician and regularly sees a psychologist for counseling.

(ECF Doc. No. 5, PageID # 41-42).

## IV.    THE ALJ'S DECISION

The ALJ determined that Kolar: (1) met the insured status requirements of the Social Security Act through December 31, 2021; (2) has not engaged in substantial gainful activity since the alleged onset date (i.e., March 30, 2017); (3) has the following severe impairments: "traumatic partial amputation of the left forefoot and all toes of the left foot, 'status post' (s/p) surgical revision amputation and s/p tendon transfer surgery; and major depressive disorder (MDD) and generalized anxiety disorder (GAD) (20 CFR 404.1520(c))[;]" (4) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments; and (5) has the residual functional capacity ("RFC") to perform light work. (ECF Doc. No. 5, PageID # 35-36, 40-41).

Regarding the severity of Kolar's impairments, the ALJ explained:

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).**

Generally, none of the claimant's own medical sources has indicated clinical findings on physical examinations or results of diagnostic laboratory testing that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment, the undersigned considered all potentially applicable listed impairments but gave particular attention to the following most pertinent listing: 1.05, Amputation. Careful consideration was given to this musculoskeletal disorders listing when reviewing the medical evidence. However, the objective medical signs from physical examinations and the results of diagnostic laboratory testing in the record do not meet its specific criteria, and the evidence does not reasonably support a finding that the claimant's impairment medically equals its criteria or the criteria of any other listed impairment (SSR 17-2p).

With Listing 1.05B applicable to the specific type of amputation that the claimant has had at the left lower extremity, which could be considered to be "at" (but not "above") the tarsal region, the inability to use a prosthetic device needed in order to

4

ambulate effectively, as defined in section 1.00B2b of Appendix 1. Throughout the period from the alleged onset date in March 2017 through the date of the hearing held in August 2020, Mr. Kolar has confirmed that he has been able to ambulate independently, without use of a cane or other assistive device(s). While a July 2020 office note from his podiatrist reflects his recent request and prescription for a cane to assist with walking (see Ex. 15F/2-3), he testified that he had just been fitted for the cane a day before the hearing. Thus, Listing 1.05B is not met because, through the date of this decision, the claimant has been able to ambulate effectively regardless of any stump complications affecting the left foot.

### *Mental Listings and Application of Psychiatric Review Technique*

The severity of the claimant's mental impairments, considered singly and in combination, does not meet or medically equal the criteria of Listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has ***no*** limitation.

. . .

In interacting with others, the claimant has a ***moderate*** limitation.

. . .

With regard to concentrating, persisting or maintaining pace, the claimant has a ***moderate*** limitation.

. . .

Lastly, as for adapting or managing oneself, the claimant has experienced a ***moderate*** limitation.

(ECF Doc. No. 5, Page ID # 36-40) (emphasis in original).

Regarding Kolar's RFC, the ALJ concluded, in part:

Given all the medical evidence and other relevant evidentiary factors in this case, the preponderance of the evidence supports a finding that the claimant has "residual functional capacity," within the meaning of the regulations and SSR 96-8p, for a reduced range of light exertion work that requires no more than four hours of standing or walking and only occasional operation of foot controls (or other pushing or pulling) with the left lower extremity, that is otherwise limited only in the

occasional performance of all postural positionings except for never climbing ladders or ropes or scaffolds, in specific environmental intolerances for concentrated exposure to vibration and for all exposure to certain hazards in the workplace, and the above-specified mental abilities.

(ECF Doc. No. 5, PageID # 59).

Regarding the mental demands of the work environment, the ALJ concluded that Kolar:

[i]s able to meet the mental demands of a work environment that has no tasks that involve high production quotas or fast-paced production demands; where there would be only occasional interaction with coworkers, no contact with the general public, and no work tasks involving customer service duties, confrontation, conflict resolution, directing the work of others, or persuading others and no tandem tasks, that is, no tasks that require the joint or cooperative effort of coworker to complete them; and where there are only occasional changes in workplace tasks or duties.

(ECF Doc. No. 5, PageID # 41) (emphasis omitted).

The ALJ then concluded:

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is, therefore, appropriate . . . .

(ECF Doc. No. 5, PageID # 62).

In reaching these conclusions, the ALJ conducted a thorough review of the record, summarized the relevant testimony and medical records, and cited the portions of the record upon which she relied. The relevant parts of the ALJ's analysis are discussed more fully below.

## V.     LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

   **B.   Standard for Disability**

   The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is entitled to DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

## C.    Discussion

Kolar raises three issues for judicial review. First, Kolar argues that the ALJ's decision was constitutionally defective because the ALJ derived her authority from Andrew Saul, whose appointment as Commissioner of the Social Security Administration violated the separation of powers. Second, Kolar argues that the ALJ's RFC was not supported by substantial evidence. Third, Kolar argues that the ALJ erred in her determination regarding the persuasiveness of his treating sources, and when she failed to include the need for a cane in her RFC. (ECF Doc. No. 9-1, PageID # 1119).

### 1.    The Constitutional Challenge

Kolar argues that the ALJ's decision was constitutionally defective because the ALJ derived her authority from Andrew Saul, whose appointment as Commissioner of the Social Security Administration violated the separation of powers. For the reasons that follow, Kolar's challenge to the constitutionally of the ALJ's decision lacks merit.

Initially, I note that Kolar's complaint does not include any constitutional claims. (ECF Doc. No. 1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Id*. (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In his merit brief, Kolar grounds his constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to give notice of the claim when he filed his complaint in July 2021. Accordingly, his constitutional claim – advanced for the first time in his

merit brief (ECF Doc. No. 9-1) – is procedurally improper. *See, e.g.*, *Hawes v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02848-DAR, 2022 WL 2346998, at *7 (N.D. Ohio Apr. 15, 2022), *report and recommendation adopted sub nom. Hawes v. Kijakazi*, No. 5:20-CV-02848, 2022 WL 2342642 (N.D. Ohio June 28, 2022).

Even if considered on its merits, however, Kolar's constitutional claim fails. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a). *See Social Security Administration, Executive Bios, Andrew Saul*, https://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited Sept. 12, 2022). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (ECF Doc. No. 9-1, PageID # 1128; ECF Doc. No. 11, PageID # 1168); *see also Seila Law LLC*, 140 S. Ct. at 2197 (statutory restriction on the President's ability to remove the head of an agency "for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *Collins v. Yellen,* 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held that a statutory provision allowing the President to remove the Director of the Consumer Financial Protection Board ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id.* at 2208,

2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. The Court addressed this issue in *Collins v. Yellen*.

In *Collins*, the Supreme Court considered a similar statute governing the removal of Directors of the Federal Housing Finance Agency ("FHFA"). The majority held that, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

The *Collins* Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788; *id.* at 1778 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11) ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment"). Rather, to obtain reversal of an agency decision, a plaintiff would need to demonstrate "compensable harm" flowing from the unconstitutional removal clause. *Id.* at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789.

Here, Kolar claims he did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to

an unconstitutional removal provision. (ECF Doc. No. 9-1, PageID # 1128). Additionally, Kolar claims that "Mr. Saul implemented changes to HALLEX and new regulations which impacted [him] and his application for benefits[,]" and he was harmed by "the modifications which were implemented during [Mr.] Saul's tenure as Commissioner." (*Id.* at PageID # 1129).

As in *Collins,* the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Kolar showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to him.

Moreover, Kolar does not address the fact that the specific ALJ who presided over his case – Judge Goodrich – was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* ECF Doc. No. 11, PageID # 1170). Because then-Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Then-Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (citing 12 U.S.C. § 4512(f)) (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge

of administrative duties would be seriously hindered.").

Because then-Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between then-Acting Commissioner Berryhill's ratification of Judge Goodrich's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude that Kolar has not shown that then-Acting Director Berryhill or Judge Goodrich lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Other federal courts in this judicial district, this state, and across the country, have also concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g.*, *Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis. Thus, even if Kolar's constitutional claim was procedurally proper – which it is not – he has not articulated a specific, compensable harm that he sustained as a result of the unconstitutional removal provision in § 902(a)(3). As a result, his argument lacks merit.

## 2. The ALJ's RFC is Supported by Substantial Evidence

Next, Kolar argues that the ALJ's RFC was not supported by substantial evidence because she failed to properly evaluate the evidence documenting the combination of his severe impairments, which – he argues – preclude him from engaging in substantial gainful activity on a sustained and full-time basis. For the reasons that follow, Kolar's argument lacks merit.

Kolar makes several sub-arguments in support of his position, including: (1) the ALJ erred by finding that he had been able to effectively ambulate despite the amputation of his left foot and

related complications; (2) the ALJ erred by finding that he had only "moderate limitations" regarding the psychological listings (i.e., Listing 12.04 and Listing 12.06); (3) even if the ALJ accurately concluded that he was capable of performing some daily activities, the evidence did not establish that he could engage in gainful activity on a sustained basis, and the ALJ erred by failing to consider the totality of the evidence; (4) the ALJ erred by determining that his statements regarding the debilitating and intense nature of his pain were only partially consistent with the record, and that a cane was not medically necessary to support his standing or walking; and (5) his functional limitations were sufficient to establish disability, and the ALJ "did not build an accurate and logical bridge between the evidence documenting [his] disabling problems and the ALJ's decision to deny benefits." (ECF Doc. No. 9-1, PageID # 1139-40). I will address each argument in turn.

### i.      *Kolar's Ability to Effectively Ambulate – Listing 1.05B*

Kolar argues that the ALJ erred by finding that he had been able to effectively ambulate despite the amputation of his left foot and related complications. For the reasons that follow, Kolar's argument lacks merit.

At the time of Kolar's hearing, Listing 1.05 provided that a person is disabled if "[o]ne or both lower extremities at or above the tarsal region" has been amputated, "with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b . . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.05(B). The "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* at 1.00(B)(2)(b)(1). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.* at 1.00(B)(2)(b)(2). "[E]xamples of ineffective ambulation include, but are not

limited to, the inability to walk without the use of a walker, two crutches or two canes," and "the inability to carry out routine ambulatory activities, such as shopping and banking . . . ." *Id.*

> Regarding Kolar's ability to effectively ambulate, the ALJ provided the following analysis:

> With Listing 1.05B applicable to the specific type of amputation that the claimant has had at the left lower extremity, which could be considered to be "at" (but not "above") the tarsal region, the medical evidence of record does not document any stump complications resulting in a medical inability to use a prosthetic device needed in order to ambulate effectively, as defined in section 1.00B2b of Appendix 1. Throughout the period from the alleged onset date in March 2017 through the date of the hearing held in August 2020, Mr. Kolar has confirmed that he has been able to ambulate independently, without use of a cane or other assistive device(s). While a July 2020 office note from his podiatrist reflects his recent request and prescription for a cane to assist with walking (see Ex. 15F/2-3), he testified that he had just been fitted for the cane a day before the hearing. Thus, Listing 1.05B is not met because, through the date of this decision, the claimant has been able to ambulate effectively regardless of any stump complications affecting the left foot.

(ECF Doc. No. 5, PageID # 36-37).

Kolar argues that, contrary to the ALJ's findings, the evidence indicated that he had "noticeable difficulty ambulating" as a result of the amputation of his left foot. (ECF Doc. 9-1, PageID # 1131). In support of his position, Kolar cites medical records from Dr. Stephan Mavissakalian (a chiropractor), who noted that Kolar: (1) had pain with tightness and stiffness in the left ankle with restricted range of motion on August 4, 2017 (ECF Doc. No. 5, PageID # 557); (2) was leaning to the right and limping on September 15, 2017 (ECF Doc. No. 5, PageID # 573); (3) reported on September 27, 2017, that his symptoms and intensity of pain had increased since his last visit (ECF Doc. No. 5, PageID # 572); and (4) reported on January 26, 2018, that he was wearing an orthotic insert but takes his shoes off at the end of the day (ECF Doc. No. 5, PageID # 570). Kolar also cites medical records from Dr. Nathaniel Hamm (a podiatrist), who noted that Kolar had a "[s]light shorter gait on left" (ECF Doc. No. 5, PageID # 833), and "noted hip tilt" (ECF Doc. No. 5, PageID # 1087, 1089, 1096). Kolar concludes that these records demonstrate that he was unable to sustain a reasonable walking pace over a sufficient distance to be able to

carry out his activities of daily living and, therefore, demonstrate that he was unable to ambulate effectively.

In response, the Commissioner argues that substantial evidence supported the ALJ's decision because Kolar confirmed that he had been able to ambulate without the use of a cane throughout the record and had only been fitted for a cane the day before the hearing. The Commissioner also points out that Kolar reported that he went on light shopping trips and to his kids' soccer games.

Throughout her decision, the ALJ discussed Kolar's daily activities, including his ability to care for himself and his children. For example, the ALJ cited Kolar's reports that he could go on light shopping trips, attend his kids' soccer games, drive his kids to school, and mow his lawn with the help of his father. (ECF Doc. No. 5, PageID # 38; *id.* at Exhibit 3E, PageID # 348-350). While the medical records Kolar cites above show that he experienced pain and discomfort while walking, they do not show – nor has Kolar otherwise established – that he could not effectively ambulate. Moreover, as the ALJ pointed out, as of the date of the hearing, Kolar had not been using a cane to ambulate. (*See* ECF Doc. No. 5, PageID # 77). Accordingly, the ALJ did not err by finding that the record established that Kolar had been able to effectively ambulate through the date of the hearing.

### ii. Listing 12.04 (Depression) and Listing 12.06 (Anxiety)

Kolar argues that the ALJ erred by finding that he did not satisfy the criteria for Listing 12.04 (depression) and Listing 12.06 (anxiety). For the reasons that follow, Kolar's argument lacks merit.

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a

listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App. 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). "A claimant must do more than point to evidence on which the ALJ could have based [her] finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App. 639, 641-42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App. 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 12.04 establishes the criteria for affective disorders, while Listing 12.06 establishes the criteria for anxiety-related disorders. *See* 20 C.F.R. § 404, Subpart P, Appendix 1, §§ 12.04, 12.06. In order to meet either Listings' required level of severity, the claimant must show that he meets: (1) the impairment-specific medical criteria in Paragraph A; and (2) the functional limitations criteria in Paragraphs B or C. *Id.* at §§ 12.00(A)(2), 12.04, 12.06. Kolar has not argued that he met the criteria for Paragraph C. Accordingly, the discussion below is limited to Paragraphs

A and B.

To meet Paragraph A under Listing 12.04 for depression, the claimant must show medical documentation of:

Depressive disorder, characterized by five or more of the following:

(a) Depressed mood; (b) Diminished interest in almost all activities; (c) Appetite disturbance with change in weight; (d) Sleep disturbance; (e) Observable psychomotor agitation or retardation; (f) Decreased energy; (g) Feelings of guilt or worthlessness; (h) Difficulty concentrating or thinking; or (i) Thoughts of death or suicide.

*Id.* at § 12.04(A)(1).

To meet Paragraph A under Listing 12.06 for anxiety, the claimant must show medical documentation of:

Anxiety disorder, characterized by three or more of the following;

(a) Restlessness; (b) Easily fatigued; (c) Difficulty concentrating; (d) Irritability; (e) Muscle tension; or (f) Sleep disturbance.

*Id.* at § 12.06(A)(1).

Listing 12.04 and Listing 12.06 share the same Paragraph B criteria. To satisfy Paragraph B, the claimant must show medical documentation that his mental health condition resulted in an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) [u]nderstand, remember or apply information; (2) [i]nteract with others; (3) [c]oncentrate, persist or maintain pace; (4) [a]dapt or manage oneself." *Id.* at § 12.04(B); 12.06(B). Kolar's arguments regarding the Paragraph B criteria relate to subsections (2) through (4) only. The following analysis will be limited accordingly.

In her decision, the ALJ acknowledged that Kolar met the Paragraph A criteria for depression and anxiety but determined that Kolar's mental impairments did not satisfy the Paragraph B criteria because they did not cause at least two "marked" limitations or one "extreme" limitation. (ECF Doc. No. 5, PageID # 40). Regarding Kolar's ability to interact with others, the

ALJ found that Kolar has a moderate limitation, explaining:

> Mr. Kolar has alleged that, since the traumatic onset of his physical impairment involving his left foot, he has experienced anxiety that increases in intensity with his pain level, disrupts sleep, and affects his ability to leave the house more than a couple times per week (Ex. 3E/1,6; 6E/2; 7E/5). He has also alleged a short temper and snapping at his wife and children. He indicated reduced frequency of seeing friends and other family members since the injury and surgeries for his left foot. At the hearing, he testified that he still does not do well with his anger and still snaps at others.

> While these statements are reasonably echoed in his presenting complaints to his counseling psychologist over the past four years and at each of the two one-time psychological evaluations held in connection with his claim for worker's compensation benefits, and thus support some significant limitation caused by major depressive and generalized anxiety disorders on his abilities to interact with others, many other relevant factors about his social relationships and demonstrated ability to interact appropriately with those and other medical sources support at most a moderate degree of such limitation. For instance, while testifying at the August 2020 hearing that he no longer drives, Mr. Kolar had driven himself to the latter psychological examination held in June 2019, and he presented with cooperative and responsive behavior, made and maintained consistent eye contact with an unfamiliar psychologist, and he did not display any anger or irritability but was sad and depressed ("dispirited") in his mood and affect (Ex. 5F/2,5). At that time, consistent with his written responses to the Function Report, he conveyed leaving his home rather regularly to go on "light" shopping trips, to attend his son's or daughter's soccer games, to spend time with his wife and three children while having reduced contacts with friends, and driving his children to and from school every day (Ex. 5F/5; and see Ex. 3E/2-5). In the Function Report, he added that he speaks to his father and that his father helps him to maintain his yard by mowing the lawn, and that he gets along with authority figures "ok" (Ex. 3E/5,7).

> Over the course of individual counseling sessions since May 2017, Patrick Yingling, Psy.D., has rated limitations in social functioning caused by psychological symptoms of major depressive disorder and generalized anxiety disorder as mild to moderate, notably improving to mild as of July 2019 and continuing through January 2020 (see, e.g., Ex. 7F/139,141,134; 7F/137; 12F/169; 13F/57). Dr. Yingling accounted for Mr. Kolar's subjective reports of withdrawing from others at times when he feels overwhelmed, having some irritability and short temper in his interactions, but also ongoing social supports and being consistently engaged with his family. Although Dr. Yingling's counseling notes share no clinical observations, the mild to moderate rating of limitation in social functioning caused by the allowed psychological diagnoses support a similar rating of no more than moderate limitation in the correlating "paragraph B" criterion of interacting with others.

(ECF Doc. No. 5, PageID # 37-38).

Rather than addressing the specific findings of the ALJ regarding his ability to interact with others, or the medical records upon which the ALJ relied, Kolar argues that the ALJ failed to account for the 15-month difference between his August 2020 testimony that he no longer drives, and a record indicating that he drove himself to a doctor's appointment in July 2019. Kolar has not pointed to specific evidence that demonstrates that he reasonably could meet or equal the requirement of having an extreme limitation or marked limitation of his ability to interact with others. *Smith-Johnson*, 579 F. App. at 432 (citing *Sullivan*, 493 U.S. at 530) ("[T]he claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing.").

While Kolar does cite several medical records in support of his argument, those records indicate that:

(1) he began treatment for his anxiety in July 2016 with his primary care physician, who prescribed him medication (ECF Doc. No. 5, Exhibit 4F, PageID # 527-29);

(2) he began treatment with psychologist Dr. Yingling on May 4, 2017 (ECF Doc. No. 5, Exhibit 7F, PageID # 752);

(3) in 2019, Dr. Yingling issued a letter indicating that Kolar was experiencing anxiety, persistent worry, and intrusive negative thoughts (ECF Doc. No. 5, Exhibit 7F, PageID # 620);

(4) Dr. Yingling completed Workers' Compensation forms detailing his inability to work (ECF Doc. No. 5, PageID # 623-84, 910-19, 1017-32);

(5) as of May 4, 2017, Dr. Yingling noted that Kolar has moderate to marked limitations of his "Activities of daily living[,]" mild to moderate limitations of his "Social functioning[,]" moderate limitations of his "Concentration, persistence and pace[,]" and moderate limitations of his "Adaption[,]" that is, his "Ability to appropriately react to stressful circumstances, including the workplace; includes attendance, making decisions, scheduling or completing tasks and interactive with supervisors and co-workers[.]" (ECF Doc. No 5, Exhibit 7F, PageID # 686, 688, 690, 692, 694, 696, 698);

(6) as of September 21, 2017. Dr. Yingling opined that Kolar had no more than moderate limitations (*See, e.g.*, ECF Doc. No. 5, Exhibit 7F, PageID # 698);

(7) on March 8, 2018, Dr. Yingling opined that Kolar had made significant progress (ECF Doc. No. 5, Exhibit 7F,  PageID # 753-54), and continued to make progress

(ECF Doc. No. 5, Exhibit 7F, PageID # 755-56; *id.* at Exhibit 12F, PageID # 1006-07; *id.* at Exhibit 13F at PageID # 1053-54);

(8) Dr. Cheryl Benson-Blankenship (a psychologist) performed a psychological examination on February 28, 2017, and opined that Kolar suffers from anxiety and depression, and would benefit from psychotherapy (ECF Doc. No. 5, Exhibit 7F, PageID # 613, 619); and

(9) on June 13, 2019, Dr. Steven B. Van Auken (a psychologist) opined that Kolar could not return to his job as a landscaper (ECF Doc. No. 5, Exhibit 5F, PageID # 542).

While these records document Kolar's medial history of anxiety and depression since the alleged onset date, they do not support Kolar's assertion that he has an extreme or marked limitation of his ability to interact with others, or that the ALJ's decision as not supported by substantial evidence.

Next, regarding Kolar's ability to concentrate, persist or maintain pace, the ALJ found that Kolar has a moderate limitation, explaining:

> Here, Mr. Kolar alleged having very limited ability to concentrate, to maintain attention for longer than 5-10 minutes, and only sometimes finishing tasks at home (Ex. 3E/1,6). However, he primarily attributed these alleged difficulties in concentration and persistence to the effects of chronic pain from his physical impairment, and only in part because of anxiety and other emotionally based mental symptoms. Nevertheless, Dr. Yingling's counseling notes do consistently rate the degree of impairment in this area as moderate, improving by March 2018 to mild to moderate, which supports some significant anxiety-related and depressive-related limitation in this third area of the "paragraph B" criteria (see Ex. 7F/139,141; 12F/169; 13F/57).

> The two psychological evaluations held in February 2017 and in June 2019 at the request of the Ohio Bureau of Workers' Compensation (BWC) also support moderate limitation caused by the claimant's mental impairments alone. For instance, at the former evaluation, Mr. Kolar was able to perform a few instances of serial-7 mental subtractions; at the latter, he did so with only one minor error and at an average pace (Ex. 7F/5; 5F/5). Still, his own rating of "mildly unimpaired" concentration ability at the June 2019 evaluation is not proportionate with allegedly serious or marked degree of anxiety-related inability to concentrate or depression-related inability to persist at tasks until completion them (Ex. 5F/5). Dr. Yingling has noted some continual reports of difficulties in motivating himself to be productive, but also noted that he was able to maintain focus and to maintain a consistent routine while, at times, "juggling multiple" household responsibilities (see, e.g., Ex. 7F/88,104,133,138; 12F/152,169).

20

Finally, moderate limitation in this area is also indicated by Mr. Kolar's abilities to prepare his three children for school every morning and then to rive his children to and from school every day, which he expressed among other daily activities both in the Function Report and narratively to the examining psychologist in June 2019 (Ex. 3E/2-5; 5F/2). He also makes simple meals for himself, does household cleaning tasks and laundry chores, reads on his phone, and watches television (Id.). While pain might be limiting his abilities to perform these daily activities, and while his personal vehicle having a flat tire combined with the COVID-19 Pandemic may very well have constrained his need to drive outside the home as frequently as he had been doing over the preceding three years, these activities combine with the mild-moderate rating of limitation from his counseling psychologist and with the relevant clinical observations made by the two examining psychologists to support a rating of no more than moderate limitation caused by MDD and GAD in his abilities for concentrating, persisting, or maintaining pace.

(ECF Doc. No. 5, PageID # 38-39).

Again, the above-cited medical records that Kolar relies upon do not support his assertion that he has an extreme or marked limitation of his ability to concentrate, persist or maintain pace. Nor do they establish that the ALJ's decision regarding Kolar's ability to concentrate, persist or maintain pace was not supported by substantial evidence. To the contrary, the ALJ's determination that Kolar had a moderate limitation of his ability to concentrate, persist or maintain pace is supported by substantial evidence, including Kolar's medical records from Dr. Yingling. (*See, e.g.*, ECF Doc. No. 5, Exhibit 7F, PageID # 698 (noting a mild to moderate limitation as of September 21, 2017).

Finally, regarding Kolar's ability to adapt or manage oneself, the ALJ found that Kolar has a moderate limitation, explaining:

Mr. Kolar has described his anxiety as "terrible" in severity and, in turn, has stated that it prevents him from handling stress well and from managing changes (Ex. 3E/1,7). At the hearing, he testified about the emotional impact of his physical limitations caused by the left foot injury and related surgeries, became choked up when stating that his wife has taken on burdens of providing for the family, and conveyed that he becomes down and depressed at times and has difficulty still adjusting to the effects of the physical injury on him. As with the last two areas, Dr. Yingling's counseling notes do rate the degree of impairment in this area as moderate, improving by March 2018 to mild to moderate, and again improving to mild by July 2019, which supports some significant, but no more than moderate degree of anxiety-related and depressive-related limitation in this fourth and last

area of the "paragraph B" criteria (see Ex. 7F/139,141; 12F/169; 13F/57).

For instance, at the February 2017 BWC psychological evaluation, Mr. Kolar presented with reported anxiety and scored in the "severe" range on a Beck Anxiety Inventory, but had a "mild" score on Beck Depression Inventory and did not appear to have any significant interference from anxiety on his performance for tasks during cognitive mental status examination (Ex. 7F/4,5). Even though Dr. Yingling has more recently rated mild difficulties in this area, his 2019 and 2020 counseling notes are comparable to the previous years' reports and commonly document some ongoing and persistent worry relating to physical limitations, disrupted sleep pattern partly relating to anxiety and insomnia, and instances of irritability and anger outbursts. However, he has also documented subjective improvements in this area relating to using "adaptive strategies to manage stressors and problems in his life and to effectively engage in problem-solving, which have in turn aided his ability to significantly reduce the incidences of conflict and anger outbursts (*see, e.g.*, Ex. 7F/84,92,141-142,133; 12F/169-170).

Along periods in July 2016-January 2017 and November 2018-February 2019, Mr. Kolar's primary care physician has documented normal mood and affect on brief psychiatric examination, even at times when he did endorse increased anxiety, and his scores on the GAD-7 inventory reduced from "moderate-severe" (16) to "mild" (3-4 to 8) range (Ex. 4F/28-19; 4F/5- 2,31-35). At the July 2019 BWC-ordered psychological evaluation, Mr. Kolar presented with good attention to personal grooming, endorsing some improvement with Dr. Yingling's ongoing counseling sessions in temper control and anxiety, and had normal speech; however, he was tearful throughout the interview and had a sad and depressed/dispirited mood and affect (Ex. 5F/2,3,5). Finally, Mr. Kolar reported to that psychologist and in the Function Report that he drives, takes care of things around his house to the extent of alleged physical limitations, attends regularly to personal bathing and dressing and other hygiene matters, cooks or grills or at least prepares simpler meals for himself and for his children, and spends time with his family (Ex. 5F/5; 3E/2-6). In sum, the medical and other evidence supports a finding of moderate limitation in the claimant's abilities for adapting or managing himself.

(ECF Doc. No. 5, PageID # 39-40).

Kolar has not pointed to specific evidence demonstrating that he reasonably could meet or equal the requirement of having an extreme or marked limitation of his ability to adapt or manage himself. *See Smith-Johnson*, 579 F. App. at 432. As the ALJ determined, the record establishes that Kolar has – at most – a moderate limitation in this area. (*See, e.g.*, ECF Doc. 5, Exhibit 7F, Page ID # No. 698 (noting a moderate limitation)). Accordingly, Kolar's argument lacks merit.

### iii.        *Substantial Gainful Activity on a Sustained Basis*

Kolar argues that, even if the ALJ accurately determined that he was capable of performing some daily activities, the evidence did not show that he could engage in substantial gainful activity on a sustained basis. Kolar's argument in this regard is premised upon his limitations being "marked[.]" (ECF Doc. No. 9-1, PageID # 1136).  In light of the conclusions above (i.e., that substantial evidence supported the ALJ's findings that Kolar has, at most, moderate limitations), Kolar's argument lacks merit.

### iv.        *Kolar's Testimony and the Medical Necessity for a Cane*

Kolar argues that the ALJ erred by finding that his statements regarding his pain level were only partially consistent with the record. Specifically, he challenges the ALJ's finding that his statements regarding his pain level were undermined by the fact that he was not treated from March 2017 until 2019. He argues that, despite the two-year gap in treatment notes, there is no indication that he failed to follow through on any approved treatment. He also argues that the ALJ failed to consider his pain as supported by the medical evidence and, relatedly, failed to complete a thorough analysis.

In reviewing an ALJ's decision, the Court does not make credibility determinations. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("We do not review the evidence *de novo,* make credibility determinations nor weigh the evidence."). Rather, as previously noted, judicial review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn*, 615 F. App. at 320.

In her decision, the ALJ acknowledged that the evidence "supports the existence of severe medically determinable impairments that could reasonably be expected to cause the alleged pain not only in the left foot and lower leg but also referred pain from compensating his weight when

standing or walking into the left hip and lower back." (ECF Doc. No. 5, PageID # 43-44). The

ALJ found, however, that Kolar's "statements concerning the intensity, persistence, and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other evidence

in the record . . . ." (ECF Doc. No. 5, PageID # 43). The ALJ explained, in part:

> [T]he full extent of alleged intensity and limiting effects of pain particularly on
> standing and walking abilities are not consistent with the subsequent two years of
> medical evidence, which primarily derive from chiropractic manipulation therapy
> and other treatment modalities given by Stephan Mavissakalian, D.C., and one
> documented physical therapy note from October 2017. The record contains no
> podiatric treatment notes from Dr. Hamm or any other physician for over two years
> after the March 2017 tendon transfer surgery, which is a significant absence of
> medical evidence that is not consistent with the allegedly constant and quite intense,
> functionally debilitating pain.

(ECF No. 5, PageID # 44).

Despite Kolar's argument to the contrary, he has not established that the ALJ's decision

regarding the inconsistency between his statements and the medical evidence was not supported

by substantial evidence. The ALJ's decision contained a thorough review of the evidence and a

comprehensive, multi-page analysis. While the ALJ did note the gap in podiatric treatment notes,

she also noted that Kolar's statements regarding his pain were not consistent with the medical

evidence that existed during that time. For example, she cited records indicating that: (1) Kolar's

pain intensity rating improved over time; (2) Kolar was using over-the-counter Advil to manage

his pain; (3) Kolar's range of motion at his left ankle was improving; (4) a TENS unit was ordered

for alleviating pain, which "is a conservative treatment not proportionate with what [Kolar] has

alleged to be unremitting and constant" pain; and (5) Kolar had only recently restarted taking

Lyrica for pain relief, which Kolar reported provided some relief. (See ECF Doc. No. 5, PageID #

43-48). This evidence, along with the numerous additional medical records upon which the ALJ

relied, demonstrate that the ALJ's decision in this regard was supported by substantial evidence.

*v.*        ***Functional Limitations***

Kolar argues that the ALJ failed to properly consider his functional limitations. More specifically, he argues that the ALJ failed to complete a thorough analysis at Step Three of the process (i.e., whether his impairments, or combination of impairments, meets or equals any of the listings), and disregarded any evidence that supported his testimony regarding his limitations. He also argues that the ALJ failed to "build an accurate and logical bridge between the evidence documenting [his] disabling problems and the ALJ's decision to deny benefits." (ECF Doc. No. 9-1, PageID # 1139).

As Kolar acknowledges, "an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments[,]" so long as the ALJ "conducted sufficient analyses of each of the claimant['s] impairments after carefully considering the entire record." *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002). As detailed above, the ALJ conducted a thorough review of the record and supported her decision with citations to portions of the record upon which she relied. She specifically concluded that the combination of Kolar's impairments did not meet or medically equal the severity of one of the listed impairments. (ECF Doc. No. 5, PageID # 36). She then explained her analysis regarding each listing. (ECF Doc. No. 5, PageID # 36-40). Thus, despite Kolar's argument to the contrary, the ALJ did build an accurate and logical bridge between the evidence documenting Kolar's disabling problems and her decision to deny him benefits.

### 3.   The Persuasiveness of Kolar's Treating Sources and his Need for a Cane

Next, Kolar argues that the ALJ erred in her determination regarding the persuasiveness of his treating sources, and when she failed to include the need for a cane in the RFC. Regarding his treating sources, Kolar argues that: (1) the ALJ erred by concluding that  Dr. Yingling's opinion

was not persuasive; (2) the ALJ's decision failed to include a limitation regarding interactions with supervisors despite the opinions of the state agency medical consultants; and (3) the ALJ failed to address the persuasiveness of Dr. Mavissakalian's February 9, 2018, letter. Regarding the medical necessity of a cane, Kolar argues that the ALJ erred by determining that a cane was not medically necessary even though Dr. Hamm prescribed him a cane on July 20, 2020. I will address each argument in turn.

### i.    Dr. Yingling's Opinion

Kolar argues the ALJ erred by concluding that Dr. Yingling's opinion was not persuasive. For the reasons that follow, Kolar's argument lacks merit.

 Since Kolar's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5). The Revised Regulations make clear that

supportability and consistency are the most important factors for evaluation medical source opinions. 20 C.F.R. § 416.920c(a).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical

opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4

(D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1))

(alterations in original). A reviewing court "evaluates whether the ALJ properly considered the

factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

In support of his argument, Kolar cites the "Mental Impairment Questionnaire" that Dr.

Yingling completed at Kolar's attorney's request in August 2020. (ECF Doc. No. 5, Exhibit 15E,

PageID # 404-409). The ALJ analyzed the "Mental Impairment Questionnaire" as follows:

> Very recently, on August 11, 2020, Dr. Yingling responded to a "Mental
> Impairment Questionnaire" at the request of the claimant's attorney in connection
> with this application for Social Security disabling benefits (Ex. 15E). Dr. Yingling
> rated the claimant as having an extreme limitation ("no useful ability to function")
> in the majority of work-related mental abilities listed on the form and spanning the
> four areas of mental functioning, all but a few remaining abilities were rated at a
> marked level ("unable to meet competitive standards") or at a questionably
> described "seriously limited" degree on what would correspond to the third point on
> a five-point rating scale on this form, which would only correspond to "moderate"
> limitation on the Social Security Administration's rating of severity for mental
> abilities (Ex. 15E/3-4). Further, Dr. Yingling rated an extreme limitation in social
> functioning, maintaining concentration and persistence and pace, and activities of
> daily living (Ex. 15E/5). He claimed that the claimant's symptoms of MDD And
> GAD have resulted in four or more episodes of functional decompensation, each of
> at least two weeks' duration, within a 12-month period; and he opined that she
> would be absent from a job more than four days per month.

> Dr. Yingling's August 2020 statement does qualify as a medical opinion but
> **completely unpersuasive**. Primarily, this opinion and many of its cited rationale in
> support are simply too disconnected from the contents of Dr. Yingling's own
> chronology of 2017-2020 counseling notes to be considered in any way persuasive
> opinion evidence regarding the severity and limiting effects of the claimant's GAD
> and MDD. Examples of highly inconsistent opinion for extreme to marked
> limitations and high rate of absenteeism from work due primarily to psychological
> symptoms include, but are in no way limited to:

> - Dr. Yingling's own ratings of mild to mild-moderate functional limitations within
> his own routine progress notes, which are in direct and insufficiently explained
> conflict with his own treatment of the claimant;

> - a first appearing Global Assessment of Functioning ("GAF") score of 50 on this
> form-based opinion, referring to "serious" symptoms and/or impairment in social or
> occupational functioning, on this August 2020 opinion, which is not consistent with
> those mild-moderate ratings (Ex. 15E/1);

- an overstatement of the claimant's "clinical findings," which are in fact symptoms, of low frustration tolerance, irritability, depressed mood, intrusive negative thoughts and worries, insomnia, low motivation, feelings of fatigue, and poor concentration; contrasted by a clear minimization of the claimant's only "mild" positive functional improvements and decreased intensity of symptoms with ongoing psychotherapy sessions;

- a "poor" prognosis given on this form that is directly contradicted by Dr. Yingling's perennially and consistently assigned "good" prognosis since the advent of counseling in May 2017, and is further in unexplained conflict with exemplary statements on the January 2020 progress note that the claimant is expected to "maintain the gains established thus far and continue to make gains in functioning" with continued treatment, and with the great majority of "Improving" progress rating that he gave throughout the course of treatment and even at the most recent counseling visits in May and June 2020 (see, e.g., Ex. 7F/139,81,73; 12F/107,169-170; 13F/38,40,50,54); and

- to the extent that recent worsening symptoms in the 2020 counseling notes were cited in support of Dr. Yingling's opinion by the claimant's attorney during the hearing, statements from the claimant that he continues to engage in recreational pursuits, is involved with raising and educating his children during the COVID-19 Pandemic, and is productive around his home (Ex. 13F/48,52).

Second, but further attenuating any supportability of this opinion beyond a mere summary of symptoms that are not as unimproved with counseling and periodic use of medications as Dr. Yingling has recently expressed herein, the August 2020 opinion does not record any clinical observations akin to what the two examining psychologists had observed or even what the claimant's primary care doctor had noted on brief psychiatric exam. Thus, minimal objective medical evidence is offered in support of this medical opinion for extreme and disabling severity of psychological symptoms, in spite of what his own office notes reveal to the contrary.

Third and lastly, Dr. Yingling's August 2020 opinion is not at all consistent with the normal mood and affect observed by the primary care physician even at times of reported anxiety, with the claimant's reduced ratings of anxiety on GAD-7 questionnaire within a brief time of taking prescribed Zoloft (2016-2017) and BuSpar (2018-2019) medications, and with the two examining psychologist's observations for intact memory and concentration abilities on mental status examinations.

Ultimately, the undersigned cannot avoid her initial impression stated during the hearing, even after reconsidering it in connection with the claimant's testimony at the hearing, that Dr. Yingling's August 2020 opinion does not read anything at all like his own progress notes and associated forms, and must find this opinion is simply too disconnected from and in unexplained conflict with his own mild to mild-moderate ratings of limitation in areas of mental functioning, with the claimant's own narrative statements reflected about improvement in symptoms with ongoing

counseling and implementing coping strategies for managing anger and anxiety, with his continually good prognosis and majority of "Improving" progress ratings over 2017-2020 counseling notes to be found in any way persuasive.

(ECF Doc. No. 5, PageID # 55-57) (emphasis in original).

Despite Kolar's argument to the contrary, the ALJ's decision indicates that she thoroughly reviewed Kolar's records from Dr. Yingling, and that her determination regarding the persuasiveness of Dr. Yingling's medical opinion is supported by substantial evidence.

### ii.        Interaction with Supervisors

Kolar argues that the ALJ erred by not including a limitation in the RFC regarding his ability (or lack thereof) to deal with supervisors. Kolar, however, has pointed to no authority indicating that the ALJ was required to specifically address his ability to deal with supervisors. In her decision, the ALJ indicated that Kolar was limited to "only occasional interaction with coworkers, no contact with the general public . . . ." (ECF Doc. No. 5, PageID # 41). The ALJ's finding in this regard was consistent with the findings of the state agency medical consultants, who opined that Kolar could interact with small groups of familiar people on a brief and superficial basis, and that Kolar should have no contact with the general public. (ECF Doc. No. 5, Exhibit 1A, PageID # 226; ECF Doc. No. 5, Exhibit 3A, PageID #244). Relatedly, they also opined that Kolar had a moderately limited ability to interact with co-workers and supervisors. (ECF Doc. No. 5, Exhibit 1A, PageID # 226; id. at Exhibit 3A, PageID # 243-44). Kolar has not shown that the ALJ's failure to specifically address his ability to deal with supervisors warrants the remand he requests. (ECF Doc. No. 9-1, PageID # 1143).

### iii.        Dr. Mavissakalian's February 9, 2018, Letter

Kolar argues that the ALJ failed to address the persuasiveness of Dr. Stephan Mavissakalian's February 9, 2018, letter wherein he opined that Kolar had a "permanent and total loss of the use of his left foot[,]" "lost the ability for normal gait using his left foot[,]" and will

have "further complications of the left lower extremity that will include the hip, knee and ankle as well as the low back." (ECF Doc. No. 5, Exhibit 6F, PageID # 607). In response, the Commissioner argues that Dr. Mavissakalian's February 9, 2018, letter was not a medical opinion pursuant to the regulations, and that the ALJ did not err by not addressing its persuasiveness. For the reasons that follow, Kolar's argument lacks merit.

At Step Four of the five-step process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [she] considered the medical opinions" in adjudicating a claim. *Id.* In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

Of course, a prerequisite for requiring any articulation is that the evidence be a medical opinion. A medical opinion is "a statement from a medical source about what [a claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations" in his ability to perform the physical and mental demands of work activities and his ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). Judgments about the nature and severity of a claimant's impairments, medical history, diagnoses, treatment prescribed with response, and prognoses are all considered "[o]ther medical evidence" and are not medical opinions. 20 C.F.R. § 404.1513(a)(3). The ALJ is not required to explain how she considered medical evidence. 20 C.F.R. § 404.1520c (stating only that the ALJ is required to articulate how she considered medical opinions and prior administrative findings).

Dr. Mavissakalian's letter did not address what Kolar could still do despite his

impairments, nor did it address any impairment-related limitations or restrictions in is ability to perform the physical and mental demands of work activities and his ability to adapt to environmental conditions. Instead, his letter was "[o]ther medical evidence." 20 C.F.R. § 404.1513(a)(3). The ALJ, therefore, was not required to explain how she considered it.

<em>iv.</em>      <strong><em>Medical Necessity of a Cane</em></strong>

Kolar argues that the ALJ erred by determining that a cane was not medically necessary even though Dr. Hamm prescribed him a cane on July 20, 2020. (ECF Doc. No. 5, Exhibit 15F, PageID # 1087-88). For the reasons that follow, Kolar's argument lacks merit.

Regarding the medical necessity of a cane, Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *7 (Jul. 2, 1996), provides the following:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

(Emphasis in original).

The medical record Kolar relies upon to establish the medical necessity of a cane states: "c9 for single prong to increase stability with mobility[.]" Even if this satisfied the first requirement above (i.e., medical documentation establishing the need for a cane), it does not satisfy the second requirement (i.e., medical documentation describing the circumstances for which the cane is needed). As a result, Kolar did not satisfy the criteria under SSR 96-9p, and the ALJ did not err by determining that a cane was not medically necessary.

## VI.    RECOMMENDATION

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Kolar's assignments of error and AFFIRM the Commissioner's decision.

Dated: September 15, 2022                    s/Jennifer Dowdell Armstrong
                                             Jennifer Dowdell Armstrong
                                             U.S. Magistrate Judge

## VII.  NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same

argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).